The defendant has appealed from a judgment in favor of plaintiff awarding him compensation for total and permanent disability in the sum of $18.15 per week for a period not exceeding 400 weeks, plus medical expenses in the sum of $110 and expert witness fees in the sum of $25 each for seven doctors who testified in the case. Counsel for plaintiff in their brief ask for an increase in the compensation to the maximum of $20 per week, however, no answer has been filed to the appeal, and we cannot consider an amendment of the judgment in this respect.
There is little dispute as to the facts in the case. Plaintiff had been working for the defendant company for many years as a glue cooker, and at the time of the alleged accident and injury on July 3, 1941, he was about seventy-five years of age and had worked regularly on this job for several years. It is conceded that he had arteriosclerosis — hardening of the arteries — and high blood pressure, a condition so often found in advancing age. On the *Page 819 
date mentioned, he suffered a stroke of apoplexy or cerebral hemorrhage, which caused him to become partially paralyzed on his right side and limbs, admittedly incapacitating him from performing his usual work. The principal question in the case involves both one of fact and one of law — of fact, as to whether or not plaintiff suffered an accident which was a contributing cause of the rupture of a cerebral artery, and a question of law, as to whether or not there was any accident and causal connection between the alleged injury and the present disability within the compensation law.
The glue room is located on top of the mill and is reached by ascending a perpendicular ladder extending from the ground floor to a wooden platform some 12 feet from the ground floor; thence following a kind of cat-walk for several feet to another ladder which extends some 8 feet further up to the glue room. In this room there are about seven steam kettles in which the glue is mixed and cooked. When these kettles are in operation the temperature in the room is very high, and the evidence shows that on the date of the alleged accident the room was unusually warm, so much so that the cooks had to take off the aprons that they were required to wear during the cooking process.
Some of the sacks of glue weigh over 200 pounds each while there are other sacks that weigh about 100 pounds each. These sacks of glue are pulled up into the glue room by means of a rope and pulley, and after the sacks reach the glue room, it was part of plaintiff's duty to unloose them from the rope and stack them up in the room. When the glue was to be cooked, plaintiff would put the sacks on scales some six or eight inches from the floor and after weighing the glue, he would scoop it out of the sacks and put it in the kettles for cooking, and at times he would lift a partly empty sack and pour the remaining contents into the kettle. He had a small hand truck on which to move the sacks around the room, but it was necessary for him to do considerable lifting in putting the sacks on and off the truck and the scales, and in dragging the sacks around the room. Sometimes plaintiff had a helper, particularly when he was mixing two kinds of glue, but he did most of the work himself.
Plaintiff came to work on the day of the alleged accident just before six o'clock and worked by himself at his job until around 9:30 when his helper came on. While the latter says that he came on at seven o'clock, yet we are inclined to believe that he is mistaken about the hour, as the plaintiff states that the helper came on about 9:30. In any event, the helper admits that plaintiff did all the handling of the sacks on the truck that day before he complained of feeling bad around ten o'clock. As plaintiff's account of what he did on that morning and what happened to him is very clear and practically undisputed, we will give a brief summary of his statement.
He worked for about three and a half hours that morning, handling the sacks of glue, putting them on the scales and emptying them into the kettles; the room was unusually hot; he had all he could do that morning, and around 9:30 when his helper came up, he told him that he was going down for a drink of water; he was very hot and descended the two ladders to the ground floor where the water fountain was located; just as he got to the foot of the ladder, he felt a roaring or whirring sound in his left car, and he soon thereafter had a dead or numb feeling in his right arm and leg; he sat down and rubbed his arm and leg a few minutes and was able to climb up the ladders with some difficulty to the glue room; he told his helper that he felt sick, but continued on the job, doing only light work; around two o'clock he began to feel worse, and shortly thereafter attempted to fill out a report of the day's work but could not hold the pencil in his hand; after knocking off for the day, he managed to get down the ladders to the ground, but his right side gave way just as he reached the ground, and he had to be assisted to a car in which he was taken home in a semi-conscious condition. Another important fact to note in connection with plaintiff's account of the occurrence is that some fifteen minutes elapsed from the time he performed the last labor in the glue room and the time he reached the bottom of the ladder and felt the first symptoms of the stroke.
Dr. W.A. Dial saw plaintiff soon after he reached home and found that he was suffering from a cerebral hemorrhage. Subsequent treatment of the patient by this doctor caused him to express the opinion that he had hardening of the arteries, and that this condition, coupled with the physical exertion and overheating in connection *Page 820 
with plaintiff's work, caused his blood pressure to rise, producing a rupture of the cerebral artery.
Dr. J.R. Godfrey was called in by Dr. Dial to see plaintiff two or three days after he suffered the stroke. Dr. Godfrey found that plaintiff had hardening of the arteries and rather high blood pressure. He stated that the hardening of the arteries was not caused by any overexertion or overheating, but that a person with hardening of the arteries and high blood pressure could by undue physical and mental exertion cause the blood pressure to rise temporarily, putting a greater strain on the brittle or weakened arteries, and thus produce a rupture and resulting hemorrhage. He expressed the opinion that the exertion and overheating of plaintiff while working combined with his condition to cause the cerebral hemorrhage.
Doctors B.E. Nelkin and Frank Jones were called by the defendant, and they agree that undue strain or physical exertion will cause a temporary rise in the blood pressure, and that a hemorrhage from the rupture of a blood vessel in a person with arteriosclerosis usually results from increased blood pressure in these vessels. However, they say that the rupture and resulting symptoms should occur at the time of the exertion and when the pressure of the blood against the walls of the vessels is at its height and not fifteen minutes or so after the exertion is put forth. These two doctors expressed the opinion that the strain and exertion put forth by plaintiff while at work had no causal connection with the cerebral hemorrhage, but that it was a mere coincidence that the hemorrhage occurred while he was on the job; that it might just as likely have occurred while he was straining at stool or while doing almost anything else off the job.
The court called in Doctors John McKewen, T. Jeff McHugh and Ashton Robins to express an opinion on the matter. From answers made to hypothetical questions propounded to them, it appears that the first two named doctors rather support the opinion of Drs. Nelkins and Jones that the exertion and overheating had no causal connection with the hemorrhage for the reason that it did not occur at the height of the exertion. Dr. Robins, however, was of the opinion that the exertion and overheating did precipitate the hemorrhage; that the elevation of blood pressure caused from lifting and handling the sacks continued and persisted while plaintiff was descending the ladders.
The medical evidence indicates that a warm temperature does not tend to increase the blood pressure but rather has the opposite effect. However, the sudden lowering of the temperature does have the effect of raising the blood pressure. It is also shown that the blood pressure will subside in a very few minutes after the exertion ceases. Because of this fact, the defendant contends that any elevation in plaintiff's blood pressure caused from his overexertion in the glue room would have subsided before he reached the bottom of the ladders some fifteen minutes later.
However, as Dr. Robbins says, and as the other doctors admit, climbing down these two steep ladders a distance of twenty feet is considerable exercise in itself. In fact, it seems to us that for a man of plaintiff's age, climbing down these ladders required about as much physical exertion as did the performance of his duties in the glue room. Our conclusion on the factual situation is that the strain and exertion put forth by plaintiff for several hours in handling these heavy sacks in the hot glue room caused his blood pressure to rise; that the continued exercise in descending the ladders and becoming exposed to the cooler air kept the blood pressure elevated, and when plaintiff reached the floor, this continued and persistent pressure on the brittle and weakened cerebral artery caused it to rupture. The situation is somewhat similar to an automobile tire with worn fibers and blisters in the rubber when the air pressure is such as to bring the walls of the tire to the breaking point. The tire might hold up with this pressure for a while, but the continued strain will finally cause it to blow out.
During each systole (heart beat) the ventricles of the heart force blood into the arteries that are already full. The extensibility of the arteries enables them to distend and receive the extra supply of blood. When the systole is over and the force is relaxed, the elasticity of the arteries causes them to recoil to their former diameter in a normally healthy person, but as a result of age, or other cause, the walls of the arteries may become less elastic and then do not properly perform their function. This condition is called arteriosclerosis, and any increase of the *Page 821 
blood pressure against these worn out arteries is likely to cause a rupture.
If the exertion and straining in working cause such an elevation in the blood pressure of a person with hardened arteries as to cause the artery to rupture and result in a hemorrhage, this is an injury to the physical structure of the body and is such an unexpected and unforeseen occurrence as to constitute an accident within the meaning of the compensation law. It is now well established in our jurisprudence that, if excessive heat, heavy lifting or straining, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a pre-existing condition, the legal requirements are present to constitute an accident, and the injury is compensable. Wright v. Louisiana Ice Utilities Co., 19 La.App. 173, 138 So. 450; Ozbolt v. Weber-King Mfg. Co. et al., La.App., 193 So. 383; Nickelberry v. Ritchie Gro. Co. et al., 196 La. 1011, 200 So. 330.
While plaintiff was performing his work in the usual and customary way, he states that his work was unusually heavy that morning and the room was unusually warm. As one of the doctors says, to a person with hardening of the arteries and high blood pressure, hard work is more or less pulling the trigger on a cerebral hemorrhage. To argue that plaintiff might have had the stroke while off duty is merely to indulge in speculation. The fact is that he did not have the hemorrhage while off duty, but, as we have already said, the hemorrhage occurred in the course of his employment and was precipitated by the elevation of his blood pressure produced by the lifting, exertion and straining incurred in connection with his work.
We find an appropriate example of the effect of exertion in causing a cerebral hemorrhage in a person with hardened arteries given by Dr. Louis J. Gelber in his work entitled, "Medico-Legal Text on Traumatic Injuries", beginning on page 169, as follows:
"While the plaintiff was doing some manual work, he fainted and finally went into a coma and died. It was later found that he died from hemorrhage of the brain. Autopsy showed hardened arteries. The patient also suffered from a high blood pressure. The medico-legal problem now involved is, did the exertion cause the intracranial hemorrhage or was that as a result from the hardened arteries and high blood pressure of long standing? Can it be said that an injury from overexertion by one in a debilitated condition is not an accident simply because it requires less violent exercise to produce the injury? It seems that the legal principles are the same, namely, whether the injury resulted from lifting weights as light as a bottle of milk or some form of severe physical exertion. What do we mean by personal injuries? Any damage or harm to the physical structure of the body and diseases or consequences naturally resulting and flowing therefrom, we define as personal injury. Therefore, in the above stated case, if the claimant was afflicted with hardening of the arteries previous to his date of employment and while engaged in the exercise of his duties, he received a hemorrhage of the brain which eventually caused his death, and if it can be shown that such physical exertion was the contributing cause of the hemorrhage of the brain, then such injury would be one sustained in the course of employment."
Finding no error in the judgment appealed from, the same is hereby affirmed at the cost of defendant in both courts.