ELLIS, Judge.
Our learned brother of the District Court has written a detailed and exhaustive opinion usually necessary in some compensations cases in which a liberal interpretation of the facts and the statute is required. We agree with his findings and conclusions and therefore adopt his opinion.
“The plaintiff, Henry Bramlett Shaw, alleges that on or about May 29, 1953, he was employed by the defendant, Swift and Company, as a checker, and that on that same day he was engaged in loading 100 pound sacks of salt from a van to a hand truck for storage on the premises' of the defendant company, and that while so engaged he lifted a 100 pound sack of salt which caused a compressed 12th thoracic vertebra in his back and a ruptured inter-vertebral disc, which injury has permanently and totally incapacitated and disabled him to do work of any reasonable character.
“He alleges that his wages at the time of the accident was at the rate of $1.37% per hour eight hours a day, five days a week, his total weekly earnings being $55.00 per week, and he further alleges that he has been paid no compensation although he has demanded payment thereof at the maximum amount fixed under the law, that is $30.00 per week during his disability for a period not to exceed 400 weeks, beginning May 29, 1953, with medical and hospital expenses not to exceed $1,000.
“The defendant for answer admits that it operates and did operate at the time of the accident, on South 14th Street in the City of Baton Rouge, a plant for the storage of meat and other rendered meat products, which business is dangerous and hazardous within the sense and meaning of the Workmen’s Compensation Law. It denies the alleged accident or that the plaintiff sustained any injury while doing any work during the course and scope of *300 his employment, and particularly denies that the plaintiff is permanently and totally disabled to do any work of a reasonable character, or that he is entitled to recover compensation in any sum whatsoever.
“The questions presented for decision are:
“(1) Has. the plaintiff proved by a preponderance of the evidence that, while performing duties arising out of his employment by defendant he experienced a compensable accident; (2) if so, did he suffer any injury of such a nature as to render him permanently and totally disabled to do work of any reasonable character.
• “The evidence shows conclusively that plaintiff was, as alleged in his petition, engaged in loading or assisting in loading one hundred pound sacks of salt. His version of what happened is found on page 55 of the transcript of testimony, as follows:
“ ‘Well, it was approximately 1:30 in the afternoon. Mr. Stockwell and I were told by Mr. Anders to go to this van which was outside of the plant by the loading and unloading platform, and he told us to unload the fifty sacks of 100 pound salt, sincg they had laid the negroes off, laid all the colored labor off a 12 o’clock, and there wasn’t anyone left there to unload the salt, so we unloaded it, and got to about the forty ninth sack and I began to feel weak and nauseated and I had some pain in my back but I didn’t pay any attention to it because I didn’t realize I was hurt, so when we finished getting the salt out of the van on to the flat we rolled it back inside of the building, back into the plant, and I immediately reported the way I felt'to Mr. Anders. I told him I was sick and nauseated, weak, hot and he told me to go in the cooler and sit down and cool off in there. I went'in the cooler and cold sweat popped out on me. I began to have chills. I came back to the shipping desk where he was standing, and he told me to go in his little office, which was a little place by the side of the wall, and told me to sit down there by the fan, and I told him I wasn’t feeling too good and I thought I’d go and I would come back, to work Monday if I felt like it. Well, I went home — just a moment. I had my car parked on North Boulevard and when I went across the street a pain hit me in the back — the worse one I’ve had yet, — I made it to the car and I sat there and rested about five minutes and the pain gradually passed off and I went on home. I kept thinking I was going to be all right and didn’t think about going to a doctor or anything at that time.’
“Fred Stockwell, a fellow employee, called for cross-examination, beginning on page 51 of the transcript of testimony testified, as follows:
“Q. Did you have occasion to unload a truck trailer of hundred pound sacks of salt with Mr. Shaw? A. Yes.
“Q. How was that done? A. Well, he would take an end of the sack and I would take the other end and we would lift it on to the float.
“Q. By a float you mean a low slung kind of dolly do you not, or cart, that they could pull inside the plant? A. It’s not a cart. What it is it’s a flat on four wheels all ballbearing.
“Q. And rubber tires? A. Yes, sir.
“Q. About how long did it take you to unload that salt? A. Oh, I think it was about twenty or twenty-five minutes. I am not exactly sure but it took about twenty or twenty-five minutes.
“Q. In other words, you all stayed with it until it was through. A. Yes, sir, I think we rested about five minutes about half way through the job.
“Q. Do you know what Mr. Shaw did after you finished or stopped unloading that salt? A. We both walked to the front of the plant where the shipping desk is located.
“Q. What did Mr. Shaw then do; did he go in the office? A. No, sir, he stood out by the shipping desk.
*301 “Q. Did he stay out there or did he later go inside the office? A. I don’t recall seeing him go inside of the office.
“Q. Did he make any complaint to you of being overheated, nauseated or being sick? A. He said he was hot and felt a little dizzy. He complained of heat.
“Q. He said he was dizzy? A. I don’t recall exactly but he did complain of being hot.
“Q. Do you know what he did after that complaint? A. What he did?
“Q. Yes. A. No, sir, I don’t recall exactly because after that I started wiping off tables and I kept on working.
“Q. Had Mr. Shaw ever had any complaint with his back prior to the time you all unloaded the sacks of salt? A. He never said anything to me about it.
“Q. Did he show any evidence of having an injured back during that time? A. The way he walked it could have been' possible.
“Q. Did he pick up other things besides the salt during that time, such ás hams, shoulders of meat, boxes of sausages? A Yes, sir, he picked them up.
“Q. Did he ever complain in doing so? A. No, sir, he never complained to me.
“Q. Was there anything slow, awkward or guarded about the way he handled them? A. Well, he did seem to be a little slow to me.
“Q. He kept on handling that stuff the whole time he was there? A. Well, yes, sir. He didn’t handle it all the time but he did handle some of it because I remember seeing him.”
, “Smiley G. Anders, another employee of defendant, on cross-examination testified as follows:
“Q. Do you recall Mr. Shaw unloading these sacks of salt from a van? A. I didn’t see him unload it.
“Q. Did you instruct him to unload it? A. I instructed Mr. Stockwell who was the receiving clerk at that time to go with Mr. Shaw to receive and unload some salt in the rear of the building.
“Q. How many sacks of' salt were there? A. I believe fifty. Fifty if I’m not mistaken.
“Q. And how much do. they weigh? A. A hundred pounds.
“Q. How did they unload them; what facilities were there for them to tinload them? A. We have a ramp or gangplank. You back these floats up in this truck and pick the salt up and stack it on the flats which are approximately knee high. Mr. Stockwell informed me they both worked, one on one end of the sack and one the other.
“Q. About what time of day was this? A. It was after dinner, approximately two o’clock I believe.
“Q. Just after unloading those sacks of salt did Mr. Shaw come tell you that he had hurt himself?. A. No, sir, he didn’t.
“Q. Didn’t he report to you and say that he was feeling badj feeling a little sick? A. No, sir, I asked him. I saw him standing behind the desk with his hand on his head and he said he kind of got hot when I asked him what was the matter. I told him to • sit down and cool off and after I would say thirty minutes I asked him how he was feeling and he said he was feeling much better and I told him that since there wasn’t much doing on Friday evening he could go ahead and check off.
“Q. Isn’t it a fact that you suggested to Mr. Shaw that he go sit in the cooler and see if that wouldn’t help out? A. No, sir, I told him to sit -down and cool off, and as far as I know he did not go in the cooler, because I immediately went on in the cooler to take stock and I would have seen him if he had come in the cooler.
“Q. Did you suggest to him that he go rest in your office, sit down there? A. I *302 told him to sit down and cool off. He could have sat in my office.”
"It will be noted that in his testimony (p. 55 tr. of t.) Shaw said:
“I immediately reported the way I felt to Mr. Anders.”
“Anders, it will be remembered, in response to the question, ‘Didn’t he report to you and say he was feeling bad, feeling a little sick’ replied:
“No, sir, I asked him, I saw him standing behind the desk with his hand on his head and he said he kind of got hot when I asked him what was the matter. I told him to sit down and cool off and after I would say thirty minutes I asked him how he was feeling and he said he was feeling much better, and I told him that since there wasn’t much doing on Friday evening he could go ahead and check off.”
“The foregoing excerpts from the testimony of plaintiff, Stockwell and Anders, are sufficient to show that whether true or false, plaintiff did complain in some fashion that he had been affected by the lifting of the sacks of salt.
“As will be hereafter shown, from the medical testimony taken, Shaw was not a man of normal physical constitution, and as is further disclosed by the medical testimony, even if what Shaw was doing was not sufficient to activate a previously existing physical weakness from which he suffered.
“The evidence shows that plaintiff was examined by numerous doctors, namely Dr. J. Willard Dowell, Dr. Carlton L. Harris, Dr. Jos. A. Sabatier, Jr., Dr. Milton L. Harris, Dr. H. W. A. Lee, Dr. D. A. Freedman, Dr. Joseph P. Tomsula and Dr. Forman.
“To say the least, some of the medical testimony is confusing to the lay mind, just as the question of a proper diagnosis was confusing to the medical doctors.
“Aside their testimony several of the doctors made written reports of their findings, namely, Dr. Forman, Dr. J. Willard Dowell, Dr. Carlton L. Harris, Dr. Saba-tier, Dr. Milton L. Harris and Dr. David A. Freedman, all of which reports will be found in the record.
“The quotation of these reports, in full, would make this opinion entirely too lengthy. In lieu thereof, I will quote sufficiently from each report to show the conclusion reached by each of the medical men.”
Dr. J. Willard Dowell
“Dr. Dowell examined plaintiff July 8, 1955. He says:
“ ‘At the time of my examination the patient is complaining chiefly of pain in the upper back. He describes the pain as running up to his neck. The pain is aggravated slightly by coughing or sneezing. The patient doesn’t feel that his back has made any recent improvement.
“ ‘On examination there is generalized tenderness rather than localized over the upper back and neck. This tenderness is more pronounced over the lower dorsal vertebra and over the lower dorsal vertebra and over the paravertebral muscles at the cervical level. On examination of the neck, there is some limitation of active rotation and flexion of the neck. On carrying out . these motions, the patient states that it pulls the muscles lower down in his back.
“ 'On examination of the lower back it is noted that there is very little localized tenderness. There is some restriction of lumbar flexion with the patient able to flex his spine and hips so that his fingertips were twelve inches from the floor. The patient complains of some discomfort on all back motion. There is a complete range of hip motion. The left leg measures one-half inch more in length that the right. The patient complains of pain on straight leg raising at 130 degrees bilaterally.
“ ‘Tendon reflexes of the legs are active and physiological. There is no impairment of skid sensation noted the legs.
“ ‘The x-rays of the spine which had been taken at Our Lady of the Lake Sanitarium *303 were reviewed. These x-rays showed no evidence of fracture or dislocation. They did show slight compression deformities in the lower dorsal spine and some arthritis changes there. It is felt that these changes are old and in no way due to the recent trauma. I talked to Dr. Sabatier as the patient had told me that a sedimentation rate had been performed at the Baton Rouge Clinic. Dr. Sabatier tells me that the sedimentation rate is within normal limits.
“ ‘It is my opinion this patient has incurred a paravertebral muscle sprain at the dorsal level at the time of his lifting the sack of salt. He has rather generalized tenderness of muscles and has some actual muscle spasm present. As the tenderness is quite noticeable and so generalized, it is my opinion that the patient probably has some inflammatory changes secondary to a low grade rheumatoid or rheumatic condition. I feel that he is disabled for any type of work at this time. As the tenderness is not well localized, it would be difficult to recommend any type of brace for him. I estimate that he will be disabled an additional eight weeks. I would suggest deferring any final evaluation for evidence of any permanent disability until maximum improvement has taken place.’ ”
Dr. Carlton L. Harris
“Dr. Harris examined plaintiff June 1, 1953. He reports that:
“ T first saw Mr. Shaw on 6/1/53 for his present disability. He gave a history of picking up 100 lb. bats of salt at work when he started having pain in his lower abdomen and right inguinal region. The pain became progressively worse and patient was admitted to Our Lady of The Lake Hospital.
“ ‘On physical examination, at that time, patient had a moderate amount of pain and tenderness in his lower abdomen, with mild rigidity. There was also a moderate amount of tenderness in the right inguinal region. No hernia was found. He complained of considerable pain.
“ ‘He developed urinary retention, so I asked Dr. H. C. Hatcher, Urologist, to see Mr. Shaw since, at that time, I believed his symptoms were urological. Dr. Hatcher was of the impression that urinary disease was not causing patient’s pain. Dr. H. W. A. Lee also saw the patient at this time, and none of us believed on first examination that his pain and other symptoms were due to any injury that he might have received. Later on, though, he developed severe pain in the right upper quadrant, radiating to the posterior chest with some rigidity in the right upper quadrant, additional urinary retention, and gastro-intestinal symptoms as well. On further examination and laboratory work, including x-rays (of his lumbar and thoracic spine, intravenous pyelogram, bariam enema, K.U.B.) we found that patient had some compression of the 12th thoracic vertebrae, possible accounting for his symptoms. He was treated accordingly and discharged from the hospital on 6/15/53, when his symptoms had somewhat subsided, after being in the hospital 16 days.
“ 'On 6/16/53, Symptoms recurred when patient was up and around after his discharge. He was readmitted to the hospital. Dr. Duane Forman, Neuro-Surgeon, was asked to see patient and he believed that nerve irritation, due to compression of the vertebrae and aggravated by lifting, brought on the acute condition. At this time, I agreed with Dr. Forman. A nerve block was done by Dr. Forman that seemed to relieve the patient complete. He was discharged for the second time on 6/21/53.
“ ‘Since patient’s last discharge from the hospital, his symptoms have been less severe but are still present. I have been seeing patient since that time, at intervals, in my office. He still has some pain, at intervals, although he is improving slowly and I believe that he will recover, although there is a possibility of recurrent attacks in the future.
“In my opinion, Mr. Shaw’s symptoms were caused by nerve root irritation as a result of compressed vertebrae that was aggravated by lifting. I apologize for my *304 delay in sending this report as requested. I shall be glad to give you additional information as to his progress in the future, if desired.’ ”
•Dr. Joseph Sabatier
“Dr. Sabatier examined plaintiff June 24, 1953. He says:
“ ‘Upon examination Mr. Shaw appears to be a rather slender white male adult who moves rather cautiously apparently because of multiple joint pain. Blood pressure is 130/80. Examination of the head and neck revealed no significant abnormality except for tenderness over the certival spine with some limitation of motion apparently occasioned by pain and tenderness. There are also multiple points of muscle tenderness in the back and extremities. Tenderness is noted over the shoulder joints, elbow joints, thoracic and lumbar spine, hip joints and joints of the feet. The examination of the heart and lungs revealed a few scattered rales over both lung fields. Abdominal examination revealed no significant abnormality.
“ ‘Because of the suspected diagnosis of rheumatoid arthritis, urinajysis, blood count, chest x-ray, hand x-ray and electro-cardiographic studies were made. No significant abnormalities were noted in these studies.
“ T believe that Mr. Shaw is suffering from mild rheumatoid arthritis which was apparently aggravated by the rather strenuous exertion indulged in on 29 May 1953. I believe that it is advisable for him to take at least several weeks of rest together with appropriate medication in order to overcome the current attack. I believe that it is reasonable to assume that he will completely recover from the current attack and will probably be in as good physical condition as he was prior to the trauma on 28 May. I am taking the liberty of placing Mr. Shaw under the care of Dr. Cheney Joseph, an Internist, for his proper guidance during the course of the current attack.’ ” ■
Dr. Milton L. Harris
“On September 4, 1953, Dr. Harris reported as follows:
“ ‘On examination, Mr. Shaw shows evidence of pain and tenderness in his back at the location of the lower thoracic and lumbar vertebrae, and pain in the hips and thighs, corresponding to the dorsal nerve segments arising from the lumbar area. While hospitalized, he had urinary retention on one occasion. At the time of my examination, the left Achilles tendon reflex was very hypo-active to absent. In June, he had pain in the lower abdomen, corresponding to the dorsal root segment of the twelfth thoracic nerve. His x-rays show abnormalities in the lower thoracic and upper lumbar spine. Under these circumstances I would be reluctant to say that Mr. Shaw does not have the pain and disability which he claims at this time. On the other hand, at the time of my examination, the neurological examination was otherwise normal, except as mentioned above. I would say, too, that the pain and physical disability, which he claims, are greater and of longer duration than most similar cases I have examined in the past, which showed no more evidence of neurological and x-ray abnormalities than Mr. Shaw shows at this time.
“ ‘There are other physical abnormalities present, but these seem to have no direct bearing on his present complaints.’ ”
Dr. Duane Forman
“As Dr. Forman performed an operation upon plaintiff, and as his report goes to some extent beyond that of the other Doctors, it will be quoted in full as follows:
“ ‘On June 17, 1953, at the request of Dr. Carlton Harris, I examined Mr. Henry Shaw while he was a patient in Our Lady of the Lake Sanitarium. Mr. Shaw is a 32 year old resident of Baton Rouge and an employee of Swift & Company. At the time of my examination the patient gave the following medical history.
*305 “ ‘The patient stated that two months previously, while on duty, he strained his back while lifting and began to suffer from pain across the lower part of his back. The pain had persisted with increasing severity, being diffuse .over the entire lower part of the back from the costal margin down and spreading into the left thigh. There had also been radiation of the pain around the pelvis into the lower abdomen bilaterally. Thorough hospital studies of the gastrointestinal and genitourinary systems had failed to reveal any abnormality to explain his symptoms.
“ ‘X-rays of the lumbarspine made on June 10, revealed old changes of compression variety in the Lower thoracic area of the spine and degenerative changes, minimal to slight, in the lower thoracic spine. There was no evidence of recent fracture or dislocation.
“ 'On examination the patient appeared to be in acute distress. There were no palpable or visible abnormalities of the spine. Movements of the lumbar spine were markedly limited in all directions because of pain. The patient claimed tenderness to pressure over the entire lower back. He was extremely tense and apprehensive, holding his back rigid. He also claimed tenderness over the lower abdomen bilaterally. Straight leg raising caused pain in the back at a few degrees bilaterally. The same discomfort was caused by flexion in the lower extremities on the abdomen. Reflexes in the lower extremities were physiologic and equal. There' was no strophy or disturbance in motor or sensory function.
“ T felt at the time that the patient had probably suffered a dorsolumbar sprain with secondary development of neuralgia of the twelfth thoracic and first and second lumbar nerves. I felt that the previously existing changes in the vertebrae at that level probably explained the chronicity of his symptoms.
“ ‘On June 17, shortly after my examination, I performed paravertebral block of tlie right eleventh and twelfth thoracic and first lumbar nerves with immediate improvement in symptoms and signs. I recommended conservative orthopedic treatment for the patient.
“ ‘Mr. Shaw was referred back to me for reexamination on August 3, at which time he stated that his condition had not improved. According to the history he gave, he had continued to have persistent steady ache in the right lumbar area. On certain movements of the trunk the pain spread in sharp radiation into both shoulders, the back of his neck, and down the back of both legs to the calf. His symptoms had been worse in the right leg. The pain had also radiated around into the right lower abdomen. He claimed that his symptoms had been aggravated by prolonged sitting or standing, and were often worse in the morning before arising. He stated also that when he woke up in the morning he was usually weak, his heart raced, and he broke out in cold sweat. This type of attack had also occurred at other times.
“ ‘Examination was more satisfactory at this time than on my previous consultation since he was ambulatory and able to assume his normal posture. He showed very slight flattening and scoliosis of the lum-bodosal spine. Movements of the lumbar spine were limited in all directions because of pain. He claimed extreme tenderness to pressure over the paravertebral area to the right of the twelfth thoracic and first and second lumbar vertebrae, and over the spinous processes of these vertebrae. There was less tenderness over the remainder of the lower back on the right side and slight tenderness over the entire lower back on the left side. When lying on his back he kept his legs flexed and experienced pain in the back on extension of the legs. There was no definite para-spinal muscle spasm. The knee jerks and ankle jerks were physiologic and equal. There was no atrophy of the musculature of the lower extremities. On sensory examination the patient claimed diminished sensibility to pin scratch and pin prick over the anterior right thigh and leg and *306 over the entire right foot. There was also slightly diminished sensation over the lower part of the back and abdomen on the right. The shoulders and neck were negative. The patient seemed to be in great distress and extremely tense and agitated.
“ ‘Immediately after the examination I performed paravertebral block with Dola-min and novacin of the right twelfth thoracic and first lumbar nerves. This was the same type of block which had afforded him marked relief in the hospital. The block on this occasion, however, served only to aggravate his symptoms.
“ T re-admitted Mr. Shaw to Our Lady of the Lake Sanitarium on August 6, and performed myelograph of the lumbar and thoracic spinal canal. The myelograms were negative. Examination of the spinal fluid was negative. The patient was discharged from the Sanitarium on August 12.
“ ‘Except for the old changes in the lower thoracic vertebrae, I had been unable in my studies to find any objective evidence of disease in this patient. After following the patient for some time I began to feel that many, if not all, of his symptoms were possibly manifestations of hysteria. I have never found any evidence of residual damage from his alleged injury.
“ ‘In order to prove the patient a complete medical investigation, I would like to refer him to Dr. David Freedman of New Orleans, who is a sound neurologist and psychiatrist. Dr. Freedman should be able to give an authoritative opinion on the nature of Mr. Shaw’s illness, whether neurological or psychiatric, and recommend any treatment indicated. If you would like for me to make the referral, please let me know.’ ”
“On the trial of the case, counsel for defendant, expressing confusion relating to the findings of the doctors from whose reports I have quoted, requested the Court to order that the plaintiff be examined by Dr. David A. Freedman, a noted neurosurgeon of New Orleans. This suggestion was also made by Dr. Forman. Such an order issued.
“Dr. Freedman examined the plaintiff November 7, 1953.
“The report of Dr. Freedman is rather lengthy. However, in order to record his views and properly explain his conclusions, the entire report is included herein, as follows:
“ ‘In accordance with your order dated November 2, 1953, I interviewed and examined Mr. Henry B. Shaw on Saturday, November 7, 1953. At the time of my examination there were available to me the reports of Drs. Duane Forman, Joseph P. Tomsula and Milton L. Harris. I did not actually see Mr. Shaw’s x-rays.
“ ‘The account Mr. Shaw gave of his accident is as follows. He had been working for the Swift Company for approximately three weeks. While he was hired as a clerk he was still in the ‘breaking in period’, during which he could be expected to do some heavy manual work. On Friday, May 29, 1953, at 2:00 P.M.. he and another man were ordered to unload fifty sacks of salt from a van to a wagon. About the forty-eighth or forty-ninth sack he felt a pain go down his back into his groin, and down the front of his legs. He states specifically that there was neither straining, sudden pulling, nor any other dramatic change to herald the onset of the pain. He continued to work and unload the remaining sacks. He then suddenly felt weak and nauseated. The supervisor advised him to sit in the cooler for a few minutes. However, he felt chilly, developed a cold sweat, and went first to the office and finally decided to go home. As he walked to his car an excruciating pain again struck him in the right costovertebral angle and radiated straight down his back and into his right groin and leg. This lasted a minute or two. He was then able to drive home. He felt better the next day but on Sunday he experienced a recurrence of symptoms. Monday he was hospitalized for the first time. Since the onset of his pain he has suffered continuously. Cold *307 weather, prolonged sitting in one position, lying in bed, all aggravate his complaints hut no matter what he does he is constantly troubled by a sharp pain in the right costovertebral angle, radiating both into his right groin and down his right leg. The leg frequently becomes numb. While, since his accident, he has been forced to return to work for another employer, he has been so extremely uncomfortable that he has given up all outside activities and spends his spare time sitting about his room, trying to read or listen to the radio, but frequently able to do nothing. This account, I might say, was frequently punctuated by expressions of his anger towards Swift & Co. for having had him do work for which he was not hired and their unwillingness to compensate him for his injury.
“ ‘Certain features of Mr. Shaw’s past history seem to me to be relevant. He is the second of four children. Until the age of twenty he lived and worked on his parents’ farm. At that time he entered the service. Five months later, in 1943, he injured his right knee which had previously been the site of osteomyelitis. One month following the injury he received a medical discharge from the service for recurrent osteomyelitis. After discharge he attended business college. He married at the age of twenty one. So far as he knew his marriage was a happy one and on specific questioning he stated that his potency was entirely normal. However, some five years later he returned from a business trip to find that his wife had sent his clothes to his sister’s home and decided to have no more to do with him. Since then, and until the present illness, he has, he states, led a normal bachelor’s life, but has had no desire to remarry. He feels that no women are trustworthy, or at least he has never seen one who is. Since leaving the farm Mr. Shaw has never done heavy work of any kind. He has had frequent changes of employment, a fact which he attributes to his following the construction industry. His siblings are all married and have children.
“ ‘In appearance Mr. Shaw is a very tall (6 ft. 3 in.) man, the tallest individual, I might add, in his family. His beard is extremely fine. He states he shaves once every three or four days. His body is entirely devoid of hair except for a small amount on the pubes and in the axillae. His skin is smooth and satiny in texture. His physique is striking in that he has' extremely long legs and a relatively short body of feminine contour. His penis is small and thin and his testes approximately the size of almonds. His gait, and indeed, all his movements, are rather stiff and labored. There is some flattening of the lumbar lordosis and limitation of motion of the spine in all directions. Straight leg raising, adduction of the hip, and flexion of the hip in association with extension of the knee, all yielded severe back pain on the right. To the left this was less marked. On direct testing all muscle groups in both upper and lower extremities seemed to me to be considerably weaker than one would anticipate in a man of such massive stature as Mr. Shaw. The tendon reflexes were brisk throughout but symmetrical, and I was able to detect no consistent and reliable abnormalities of long track, coordination, sensation, cranial nerves, or cerebral function.
“ T have gone to some length to describe Mr. Shaw’s personal history and physical habitus because it seems to me that he suffers from a severe endocrinopathy. On both physical and emotional grounds this condition is, I feel, disabling. The asthenia I noted on examination undoubtedly has a great deal to do with his seeking sedentary work. I am quite confident that any heavy labor, particularly in the heat, would be much more difficult for him than for most normal people. This factor, coupled with the observed x-ray changes, would, I feel, sufficiently explain the acute episode he suffered. The prolonged symptoms are, I feel, another matter, I have indicated that in my opinion this man has serious emotional concomitants of his physical disability. These, of course, long antedate his injury. However, it seems to me that his present reaction represents a fixation of the emo *308 tional problem on his transient somatic symptoms. How much the described change in his activity is simulated one cannot, of course, say with assurance. It is, however, most unlikely that this man could ever have had a normal heterosexual life. I would suspect that his present isolation and depression, while perhaps aggravated by his accident, also antedate the event.
“ ‘In conclusion it is my opinion that M. Shaw suffers from a severe endocrine disturbance characterized clinically by a feminine body habitus, asthenia and impotence as well as his great height and skeletal changes. Psychologically this is accompanied by depression and an attempt to deny his inability to function well as a man. Against this background and coupled with his resentment concerning being forced to do work which was both outside of the requirements of his job and beyond him physically, relatively minor and transient symptoms, which in themselves can be understood in terms of the noted compression of the 12th thoracic vertebrum, have become fixed in a neurotic fasion.’ ”
“From the foregoing reports of the several doctors who testified in the case it would appear that the majority opinion is (1) that the lifting of the sacks of salt contributed to the back injury of which the plaintiff complains. Doctor Dowell expressed the opinion that the plaintiff had incurred a paravertebral muscle sprain at the dorsal level at the time of his lifting the sacks of salt. Dr. Milton Harris expressed the same opinion, as well as Dr. Sabatier. (2) However, even if the lifting of the sacks of salt were not entirely the cause of plaintiff’s symptoms the majority opinion of the doctors seems to be that the work to which he was subjected, that is the lifting of these sacks of salt,’ aggravated a previous rheumatic, arthritic or other physical ailments which render the plaintiff unable to do the same kind of work he was doing before the accident.
“It is possible that if this man had been given a more thorough pre-employment medical examination some, if not all, of the physical defects or deformities found by Dr. Freedman would have been discovered and probably plaintiff would not have been employed.
“However, under the jurisprudence of this State to the effect that if an employee’s work aggravated a prior injury or physical defect, and that as a result thereof he no longer can do the same work he was doing at the time of the accident he is permanently and totally disabled to do work of a reasonable character. In this connection it might be well to refer to some of the decisions of the appellate courts on the subject (1) in the case of Goodman v. Hillyer, Deutsch, Edwards, Inc., La.App., 49 So.2d 60 it was said the purpose of this chapter is to assure an injured employee, who can no longer earn his living, that he will not become a public charge nor a burden upon his family, and that at least 400 weeks he will be provided for by employer for whom he was working at time he sustained his injuries.
“It was held to the same effect in Archibald v. Employers’ Liability Assur. Corporation, 202 La. 89, 11 So.2d 492.
“In other cases it has been held that the statute' should be liberally construed. Foe instance, in the case of Jones v. Hunsicker, 188 La. 468, 177 So. 576, it was said that in compensation suits a construction of liberality must prevail and that the court should construe the law liberally in the workmen’s favor and give him the benefit of any doubt
“Indeed, the appellate courts have been so liberal as to hold that even though a workman subsequent to a disability accident was capable of earning at other occupation more than he could at the occupation in which he was engaged at the time of the accident he is nevertheless entitled to recover compensation depending upon the nature and period of his disability.
“Applying the liberal construction given the statute by the appellate courts, I deem it my duty to hold that the plaintiff is permanently and totally disabled to do work of a reasonable character, and therefore entitled to recover.
*309 “In the following cases it was held that if excessive heat or heavy lifting or straining although usual and customary or both, cause or contribute to a physical breakdown, or accelerate its happening, the legal requirements necessary to constitute an accident are present and such cases are compensable. Nickelberry v. Ritchie Grocer Co., 196 La. 1011, 200 So. 330; Siscoe v. Cooley, La.App., 9 So.2d 313; Murray v. Mengel Co., La.App., 9 So.2d 818; Elmore v. Avoyelles Wholesale Grocer Co., La.App., 14 So.2d 684; Lampkin v. Kent Piling Co., La.App., 34 So.2d 76, rehearing denied 34 So.2d 636; Henderson v. E. L. Dalton & Co., 47 So.2d 111.
“Some other cases applicable to the case at bar are the following: Brannon v. Zurich Gen. Acc. & Liability Ins, Co., 224 La. 161, 69 So.2d 1; Lee v. International Paper Co., La.App., 16 So.2d 679; Gilmore v. George W. Garig Transfer, Inc., 33 So.2d 99; Reeve v. Clement-Braswell Machine and Fabricating Works; 66 So.2d 387.
“Plaintiff offered hospital and medical bills as follows, to-wit:

“For the reasons assigned, judgment will be rendered herein in favor of plaintiff and against the defendant, decreeing the plaintiff to be permanently and totally disabled to do work of any reasonable character within the sense and meaning of the Compensation Law, and accordingly entitled to compensation at the rate of $30.00 per week during his disability for a period not to exceed 400 weeks, from May 29, 1953, with interest on each past due installment from its due date until paid and in the additional sum of $748.49, representing medical and hospital bills incurred by the plaintiff as a result of said accident.
“The bills of all of the medical doctors who testified as experts are fixed at $50.00 each.
“Judgment is rendered and will be signed in accordance with the views expressed herein.”
Judgment affirmed.