CAVANAUGH, Judge.
Plaintiff sues the defendants, R. L. Car-mino and Hazel M. Toups, d/b/a Carmino Contracting Company, individually and as a partnership, and their insurer, Great American Indemnity Company of New York, for compensation at the rate of $30 per week for a period of 400 weeks, subject to a payment of compensation in the amount of $431.10, together with legal interest on past due installments and medical, hospital, drug and incidental expenses in the amount of $500, together with the 12% statutory penalty provided for under LSA-R.S. 22:658 and attorney’s fees of $1500.00.
Plaintiff alleges that he was employed by the defendant, Carmino Contracting Company, and on February 1, 1952, while performing services arising out of,- incidental to and during the course, business and trade of the defendant and while he was riding in an open truck owned by the defendant and in which he was being transported with fellow workers from Slidell to Franklinton, Louisiana, to pick up a load of telephone poles, the driver of the truck lost control of the truck, causing it to run off the highway and capsize. He alleges that he was thrown to the ground with a great force', knocked unconscious, severely injured, and was immediately carried to a hospital in Franklinton, Louisiana. Plaintiff further alleges that he suffered a ruptured inter-vertebral disc in the low lumbar area on the *416 left in the lumbosacral interspace with compression of the first sacral nerve root on the left. His rate of pay at the time of the alleged accident and injury was alleged to have been $1,075 per hour of 8 hours per day, 5 days per-week, with time and one-half for all hours worked over 40 in any one work week, and that his average weekly wage was $49.49, with overtime, and that his compensation should he the maximum rate of $30.00 per week.
The plaintiff further alleges that the defendant ceased to pay compensation on June 4, 1952, and that the installments previously paid were not for the amount due and that the defendant has, without reasonable cause, arbitrarily and capriciously neglected and refused to pay him the compensation due him after the expiration of more than sixty days after due notice and demand; that he engaged an attorney to prosecute his claim and suit and had agreed to pay him 20% and that the defendant insurance company, Great American Indemnity Company of New York, is indebted unto him in the additional sum of 12% of the total amount awarded as a penalty, plus a reasonable attorney’s fees of $1,500.
The defendants admit that plaintiff suffered an accident and an injury, but not to the extent alleged, and the payment of compensation for a- period of 18 weeks at the rate of $23.95 per week, or a total of $431.10 by the Great American Indemnity Company. They further allege that the Great American Indemnity Company paid plaintiff’s medical expenses in the amount of $237.60. Defendants pray that the plaintiff’s-demands be rej'ectéd at his costs.
After trial in the district court, judgment was rendered in favor of the plaintiff and against the defendants individually and in solido in the sum of $30.00 per week commencing February 1, 1952, and extending for a period not to exceed 400 weeks, with legal interest on past due. weekly compensation, subject to a credit of weekly payments of $23.95 each made from the date of the injury, February 1, 1952, until June 4, 1952. A further judgment was rendered in favor of plaintiff and against the defendants for $43.30 for medical expenses, together with legal interest from date of judicial demand, and recognizing the contract between plaintiff and his attorney for attorney’s fees, and the judgment fixed the fees of the expert witnesses, Dr. Dwain Foreman and Dr. Willard Dowell, at $50.00 each and taxed same as costs.
The claim of plaintiff for penalties and attorney’s fees was rejected.
Defendants suspensively appealed from the judgment, and the plaintiff has answered the appeal, asking that the judgment be amended by granting and decreeing him entitled to the penalty of 12%, plus the attorney’s fees of $1,500 as to the Great American Indemnity Company.
The evidence in this case shows that the plaintiff suffered what was thought at the time not to be a serious injury. This is evidence by the examination and report of Dr. McGehee of Franklinton and Dr. Mayer of Baton Rouge. He was X-rayed at Franklinton, Louisiana, immediately following the accident and injury and was then sent to Gonzales, Louisiana, where he was placed under the treatment of Dr. Epstein. He was examined by Dr. Louis Mayer of Baton Rouge on February 5, 1952, or 4 days after the accident, and according to his report the plaintiff had not suffered a serious injury but only bruises and contusions. Following this examination, plaintiff was under the care and treatment of Dr. Meyer Epstein of Gonzales, Louisiana, until April 11, 1952. He was treated by this physician for a lumbosacral strain with diathermy and other heat treatments, and on March 17, 1952, when plaintiff did not appear to respond to the treatment, he was referred by this physician to Dr. Moss M. Bannerman of Baton Rouge. Dr. Bannerman is an orthopedic specialist. This physician treated the plaintiff until June 4, 1952, when he advised the defendant insurance company that the plaintiff was able to resume his work.
We quote from the written reasons of the Trial Judge, in which the testimony was analyzed and on which he based his judgment for plaintiff:
*417 “The plaintiff is a colored male who has been married twenty-two years. He is thirty-nine years old, uneducated, but of fair intelligence. As a witness for himself he testified that from the date of the accident he had trouble in his back which extended down his left leg with pain and numbness practically over all his body. He claims that since the accident he has at all times been unable to do any work. He said that he told all the doctors about his back, leg, arm and shoulder pains. Plaintiff denies that he told Dr. Meyer Epstein in April of 1952 that he felt cured and able to go to work; but he admits that Dr. Bannerman discharged him as able to go back to work on June 4, 1952, and that he never went back to see the doctor.
“Immediately after the accident this plaintiff was taken to the McGehee Clinic in Franklinton, Louisiana, where he remained from about 9:00 in the morning to about 8:00 that night. Dr. McGehee, who examined and' treated him that day, reports that ‘while riding in the back of a truck the truck left the highway and he fell off causing contusion L. sacro-iliac region, left sciatic nerve, left lageral spinous muscles, in lumbar region and left glutial muscles’. Evidently this doctor made X-rays because he reports that the X-ray diagnosis was negative for fracture or dislocation involving lumbar sacral spine, pelvis and hips. This doctor estimated that the plaintiff would be able to resume work in approximately one week. (Plaintiff’s Exhibits Two and Three)
“The plaintiff left the Franklinton hospital that same night and went to Gonzales, Louisiana, where he was referred by his employer to Dr. Myer Epstein, of Gonzales, who does not claim to qualify or testify as a specialized expert, but who explained that he has been engaged in general practice for many years in the vicinity of Gonzales, Louisiana, where he has treated many industrial and oil field workers and where he has by experience learned about and treated many back and nerve injury cases. He treated the plaintiff from February 6, 1952, to April 11, 1952, and said that the plaintiff’s complaints localized in the region of the first to fifth lumbar and first sacral bones of the vertebrae, but that the plaintiff did not make any complaints about any pain radiating down his leg. Dr. Epstein said during the time he treated him the plaintiff definitely did not have a ruptured disc or sciatic neuritis; that the plaintiff told the doctor that he was well and ready to go back to work as soon as he visited his people in Mississippi, and the plaintiff was discharged as cured on April 11, 1952.
“In the course of the treatment Dr. Epstein said the plaintiff was not experiencing relief as the plaintiff should, so, taking into consideration the nature of his complaints, Dr. Epstein sent the plaintiff to Dr. Moss Bannerman in Baton Rouge on March 17, 1952. Dr. Bannerman testified that the plaintiff said that the accident hurt his back; that his hip did not bother him, but that his back was still sore. Dr. Ban-nerman noted tenderness over the sciatic nerve and in the lumbar area. This doctor thought the plaintiff suffered a bruise to his hip, moderately severe contusion of the lower back without ¡any serious nerve involvement. The plaintiff made no complaint of pain down his leg. Dr. Bannerman thought the plaintiff was .getting along all right and the doctor’s impression was that the plaintiff would go along to satisfactory recovery in about a month or six weeks from that date. (Tr. 87-89)
“Dr. Bannerman saw the plaintiff again on April 15, 1952, and found that the tenderness in his hip had entirely disappeared; that the plaintiff was feeling better; but that the plaintiff said his back was still sore when he tried to use it. This doctor thought the plaintiff still had contusion of the lower back, but that no other trouble was in *418 ’volved. He thought another month would see him ready to return to work.
“Dr. Bannerman saw the plaintiff again in May, 1952 and found the plaintiff improving right along. ■ The plaintiff at that time had good motion of his back, more strength, less soreness, although he still complained of some pain. The plaintiff told the doctor that he was considerably improved. The doctor made two reports, on May 20th and one May 29th. In his report of May 29th it shows that plaintiff had good motion, his reflexes were normal and Dr. Bannerman thought he was able to return to work and he discharged the plaintiff, but told him if he had any further trouble to come back to see the doctor. The plaintiff never returned.
“Dr. Bannerman examined this plaintiff on the day of the trial. The plaintiff then had the same complaints, but more,' and at this time the plaintiff told the doctor that since Dr. Bannerman last saw the plaintiff he had pain down his left leg which the plaintiff said dated from about the date of his last visit to this doctor. The plaintiff complained of pain as high up as his chest. Dr. Bannerman said the plaintiff had never complained previously any whatever about any injury to his shoulder or arm in the accident.
“Dr. Bannerman testified that it is significant that the complaints the plaintiff had on the day of the trial are not the same as the complaints when this doctor discharged the plaintiff. Also, that the plaintiff now has some symptoms of a ruptured disc and some symptoms which are inconsistent for disc involvement. After this examination on the day of the trial Dr. Ban-nerman said that he was not disputing that the plaintiff now has a herniated disc. The doctor found the plaintiff is presently not able to work.
“Dr. Foreman is a neuro-surgeoni He saw the plaintiff on December 9, 1952. This examination showed moderate lumbar curve, muscle spasms, tenderness over the 4th and 5th lumbar vertebrae, pain on the left side of the low back on extreme movement, numbness, loss of sensation and diminished ankle jerk on the left side. It was Dr. Foreman’s opinion that the plaintiff had pressure on the nerve right nt a lumbar disc. He felt that the plaintiff had had sufficient conservative treatment and it was this doctor’s opinion that the plaintiff was suffering from a ruptured disc and the doctor recommended surgery.
“Dr. Foreman made another examination on April 15, 1953, when the plaintiff claimed no improvement over the condition of his last examination. The doctor at that time found more muscle spasm at the spine, no diminished ankle jerk, diminished sensation to pin scratches. The numbness corresponded with the disturbance of the nerve root which he found on his first examination. He again recommended surgery. Dr. Foreman at this time reported that he thought the plaintiff would improve over a period of time, but not enough to return to physical activity within the foreseeable future. He said the plaintiff may improve for some time and then remain the same.
“Dr. Dowell examined the plaintiff on November 3, 1952, at the request of Attorney Lemuel C. Parker. He said the plaintiff was complaining of pain in the back, tenderness over the 4th and 5th lumbar vertebrae. This doctor thought the plaintiff had a possible ruptured disc. He said, “I stated in my report that the findings were rather inconsistent and the sensory changes in his left leg were apparently so extensive as to be unable to explain them on the basis of a herniated interverte-bral disc.” (Tr. 48)
“Dr. Dowell again examined the plaintiff on April 15, 1953, and at that time he did not think the plaintiff had made any improvement. It was this doctor’s opinion that there was a ruptured disc, on this examination. This *419 diagnosis 'was sufficiently positive that he recommended that the disc be removed to relieve him without a myelo-gram. He found the sensory changes better defined.
“My impression of the plaintiff is that in the first few months after the accident he improved. I believe his condition was exactly as found by Dr. Epstein and Dr. Bannerman at that time. However, on the other hand, it is possible that he was improved a few months after the accident and toward the end of 1952 the nerve involvement grew worse. At any rate, the plaintiff now contends that he has been totally disabled since the accident. Dr. Foreman and Dr. Dowell in December, 1952, found symptoms and complaints discreet with a ruptured disc diagnosis and recommended surgery for its removal in order to relieve the nerve pressure.
“Dr. Bannerman also now believes that the plaintiff is unable to work. Under the testimony there is but one verdict. There is no proof that the plaintiff suffered another accident to worsen his condition which was improving satisfactorily up to a few months after the accident.
“There is some dispute over the proper amount of compensation based on the plaintiff’s weekly wage. There is no dispute that the base pay was at the rate of $1,075 per hour. The plaintiff worked only one whole week and part of two others. In each period he made some overtime, but the overtime was not regular and the period of employment was not of sufficient length to establish that overtime must be considered. There is no evidence to show that the contract of hire was for other than the customary six days per week and in the absence of a specific contract to the contrary the six day week should be made the basis for the compensation award. Ricks v. Crowell [& Spencer Lumber Co., La.App.], 189 So. 466; Brown v. Furr [La.App.], 19 So.2d 283; Walls v. Solvay [Process Co., La.App.], 21 So.2d 109; Moffett v. Mansfield Hardwood [Lumber] Co., [La.App.], 30 So.2d 683.
“Therefore, at the hourly, rate of pay of $1,075 the weekly compensation should have been $30.00. The defendant made an error in the amount of the payments from the date of the injury to June 4, 1952, and each week in that period will be credited with $23.97, the amount paid in that period.
“The next question is on the claim for penalties and attorneys’ fees. In order for the plaintiff to be entitled to recover penalties and attorneys’ fees there must be definite proof that the defendant arbitrarily and capriciously failed and refused to pay'compensation to the plaintiff. The defendants’ acts in this case were not arbitrary and capricious for the reason that when the payments were discontinued on June 4, 1952, there were in defendant’s hands five medical reports from four doctors, two reports being from Dr. Banner-man, the orthopedic specialist, to the effect that there was nothing serious the matter with the plaintiff and indicating that he should be able to return to work. There was no medical report to the contrary until December, 1952, when Dr. Forman and Dr. Dowell reported that the plaintiff showed evidence of a possible ruptured disc.
“This plaintiff, starting in November, 1952, made an entirely new set of complaints, as compared to what he had told Doctors Epstein and Banner-man. The defendant had the report that the plaintiff was working in October, 1952, and while the plaintiff’s attorney did write the defendant in May, 1952, requesting that a proper amount be paid, there seemed to be a period of several months in which the claim was inactive, all of which gave reasonable grounds to withhold resumption of the payments.”
We have carefully examined the record here and fully concur in his reasons *420 for finding the plaintiff totally disabled to do and perform the work he was performing at the time of the injury.
The only other question presented is whether or not the plaintiff is entitled to recover the statutory penalties because of the defendants’ failure to pay compensation in the correct amount during the period of the disability between February 1, 1952 and June 4, 1952, and its failure in discontinuing compensation payments after the latter date.
 Dr. Bannerman had furnished the defendant insurance company two reports immediately preceding the date of June 4, 1952, when plaintiff’s compensation was discontinued. He is one of the recognized orthopedic surgeons in the City of Baton Rouge, and his opinion was partially based on a history given to him by the plaintiff on his first examination. A similar history was given to Dr. Dowell, another orthopedic surgeon of the City of Baton Rouge, who is just as prominent in his profession as Dr. Bannerman. It was Dr. Dowell’s opinion that plaintiff was suffering from a ruptured intervertebral disc, but he also stated that plaintiff’s complaints were inconsistent. Dr. Dowell did not examine the plaintiff until five months after his compensation payments were discontinued, of just a short time prior to the time plaintiff was examined by Dr. Duane Forman, a neurosurgeon, who was definitely of the opinion that plaintiff suffered from a ruptured disc. Defendant, subsequent to the date of discontinuing plaintiff’s compensation and after receiving reports from Dr. Bannerman, corresponded with the attorney for plaintiff, who was insisting that his rate of compensation should be increased to $30.00 per week, and who in November of that year wrote the insurance company requesting the resumption of compensation payments, and advised that the penalties would be claimed. At that time the defendant insurance company had learned that the plaintiff was engaged in farming in Mississippi but made no attempt to adjust the claim with plaintiff’s attorney. This suit was filed on February 1, 1953. The plaintiff had only worked for the defendant for a short time or between January 20th and February 1st, when he was injured. During that period, according to the work and pay record filed in the case, he earned the first week of his employment during the period between January 20, 1952 and January 23, 1952, 24 regular hours’ time and 3 hours overtime, or earned $30.63. During the following work week which was the only week where he put in a full 40 hours, he had a work record of 40 regular hours and 8% hours overtime, for which he earned $56.68. The agent of the defendant insurance company, in computing the rate of compensation, averaged the earnings over the entire period that plaintiff had worked and computed his compensation on that rate, which, of course, was not the correct way to compute the compensation. The regular work week of the plaintiff, according to-the contract of hire, was 5 days per week, or 40 hours per week, and time and a half for all time worked in excess of that number of hours, but there was no specific agreement to this effect between the plaintiff and his employer. It is our opinion that it did not make any difference; the compensation law provides that an injured employee’s compensation shall be 65% of his average weekly wages. The jurisprudence is that an injured employee’s compensation is computed on a six day per week basis even though the contract of hiring is for a less number of days. Now, the plaintiff’s average daily pay for a regular eight hour work day amounted to $8.60. This multiplied by six, the number of days in a regular work week, would amount to $51.60. Therefore, plaintiff was entitled to 65% of his weekly wage of $51.60, or $30.00 per week, the maximum compensation permitted to be paid under the statute. This is the present jurisprudence on this question as the Supreme Court construed the statute in Jarrell v. Travelers Insurance Company, 218 La. 531, 50 So.2d 22, and followed by us in Moore v. Aysen, La.App., 69 So.2d 551.
Since the case of Jarrell v. Travelers Insurance Company, supra, the courts have held that an employee’s compensation for disability benefits has to be computed on *421 six days per week irrespective of a specific contract of hiring for a less number of days in a work week, and it makes no difference whether he works one day, five days or less.
If the plaintiff is entitled to any penalty, it is our opinion that it would be only due on that part of unpaid compensation between February 1, 1952 and up until the time he was discharged on June 4, 1952, and then the penalty could only be computed on the difference ■ between the amount the insurance company paid and the $30.00, or the difference between $23.95 and the $30.00, or the 18 weeks at $6.05, which would amount to $108.90. The defendant during the trial made a tender of $79.56, the amount of compensation in arrear because of an error in computation based on an average weekly wage of $43.00, but plaintiff declined to accept it.
It is our opinion that plaintiff would not be due any penalty subsequent to June 4, 1952, because after that date the insurance company had in its possession sufficient medical evidence to warrant- its refusal to continue to pay him. We do not believe that the penalty should be inflicted in this case against the defendant insurance company because it took the rate of pay from its assured, and the assured, in reporting the claim computed the average weekly wage based on the average weekly earnings of plaintiff during the short period of his employment. The claim was inactive from May until November and during that period there was no contact between plaintiff and the insurance company. It had learned through a credit reporting agency that plaintiff during that time was farming in Mississippi.
We agree with the Trial Judge that this is not a case in which the penalty should be imposed because under the evidence the insurance company did not arbitrarily and capriciously fail and refuse to pay compensation.
For the foregoing reasons, the judgment of the district court is affirmed;