FRUGÉ, Judge ad hoc.
This is an appeal by an employer from a judgment awarding one of its employees suffering with heart disease compensation for total and permanent disability. The employee has filed an answer to the appeal asserting that the compensation rate should be $35 or alternatively, in the sum of $34.-13 instead of $32.50 as found by the trial court.
*488 The questions presented by this appeal are the following:
1. Whether the evidence supports the trial court’s finding that the appellee suffered an accident within the meaning of the Workmen’s Compensation Law.
2. Whether there is substantial evidence in the record to support a finding that the appellee is totally disabled.
3. Whether the rate of compensation of an employee who works five days for two two-week pay periods and works five and six days for two two-week pay periods should be computed on a five day week or six day week.
Plaintiff-appellee, Arthur Neldare had been employed by the defendant-appellant, Schulykill Products Company, since 1950 at the cinder hearth in its plant in Baton Rouge. Plaintiff’s work consisted in the filling of trays which measured three feet by five feet and about eight inches deep with battery plates of which thirty to thirty-five such scoopsful would be required, eight shovelsful of pot dross (a heavy substance) and then eighteen shovels or scoopsful of mud. These trays are taken by the employee with a tow motor to a windbox where they are placed under intense fire which dries the contents in about twenty minutes. While the trays are drying under the fire, the appellee must rake the substance, stirring it constantly. When the mud and other substance cakes, the operator must rake vigorously to loosen it. After the contents are dried, the trays are removed, and the operator empties and refills the trays from piles which are about seventy-five feet away from the fire. The operation is repeated over and over for eight hours a day.
On December 4, 1956 plaintiff was physically examined by Dr. James Lorio, defendant’s doctor, and his heart found to be negative or normal. Every ninety days Dr. Lorio visits the plant and takes blood tests of each employee.
On January 9, 1957 at between 8:30 and 9:00 p. m., while the plaintiff was in the act of vigorously raking the contents of one of the trays by the fire, he felt his heart quivering. He stopped what he was doing, left the fire and went for some water and rested for a while. At that time a co-employee, Willie Randall, came by on his way to drink water and stopped to talk with the appellee; the appellee told him about his heart hurting him, whereupon Randall advised taking something for it. After resting for a while, the plaintiff completed his shift, taking it easy the rest of the period. He did not tell his foreman, who was not nearby, believing the matter not to be serious. Upon reaching home he told his wife but she too believed it was something he had eaten. The next day after resting all day, he went back to work at 3:00 p. m., and that night experienced similar symptoms. He took it easy that night, intending to go to the doctor the next day, his day off. He went home. Upon arriving home he again complained to his wife about his chest pain, did not eat and went to bed. Next morning on Friday, his grown-up son took him to Dr. Lorio, the company’s doctor. Dr. Lorio advised milk of magnesia and rest and to return Monday. That night, when at the table preparatory to eating, upon drinking out of a glass of cold cool-ade he fainted and was carried to his bed. He slept the rest of the night. His wife called Dr. Lorio, who made arrangements with the hospital but he told her that if he was sleeping to let him sleep and tell him to go to his office next day. Next day his son took him to Dr. Lorio’s office and the doctor sent plaintiff to the hospital where he remained for some twelve days. At Dr. Lorio’s request Dr. Selser took a cardiogram of plaintiff’s heart. The cardiogram indicated that plaintiff was suffering from impure flutter and auricular fibrillation. Auricular fibrillation has been defined in layman’s language as rapid beating of two chambers in the heart known as the auricles, which causes the heart to beat at a too rapid pace *489 or out of rhythm. After being treated at the hospital for some twelve days he was sent home and continued under Dr. Lorio’s care. Dr. Lorio advised him to avoid hard work and especially avoid physical exertion such as manual labor for an indefinite period. The plaintiff then went to Dr. John B. Stotler, a heart specialist, under whose care he was still at the date of trial and under whose care still remains at the present time.
Plaintiff maintains that he is totally disabled due to a malfunctioning of the heart known as auricular fibrillation and dyspnea or shortness of breath.
.The lower court found and we believe correctly so that the plaintiff suffered an accident within the meaning of the workmen’s compensation law on the night of January 9, 1957 when, while in the act of strenuously raking the hardened substance drying in the trays under intense fire and heat, his heart started quivering and fluttering. It is the considered opinion of Dr. John D. Stotler, heart specialist, that this happening marked the onset of the auricular fibrillation. It is the opinion of all the doctors who testified in this case that the plaintiff, unknowingly to him, suffered arteriosclerosis for some time before January, 1957. It is the opinion of Dr. Stotler that the strenuous work plaintiff was doing, surrounded by high temperatures one moment and then cooler temperatures 'would be conducive to precipitating or causing the onset of flutter and fibrillation in a heart affected with sclerosis. Dr. Stotler further states that in the two particular areas in which we are interested in here something goes wrong or goes haywire with this pace maker and it starts sending out innumerable, practically speaking, a greatly increased number of impulses so that the atria are attempting to contract at anywhere from two hundred up to six hundred times per minute. The ventricles, the larger chambers, cannot pump that fast so they contract or pump at more or less their own rate which is usually grossly irregular, such as was the case in the plaintiff at the time of the first symptom. In the opinion of this heart specialist the fibrillation was the end result of the accident which first manifested itself by the quivering and fluttering of the heart on January 9. He states:
“I don’t feel that we have to say that. Not only do I think, but this is an accepted opinion, that an attack of arrythmia, irregular heart beat, whether they be fibrillation, flutter or runs of premature beats, when they occur in a person who has a heart disease they at first come in what we might call spurts or attacks, the attacks become more frequent as time goes on and last longer as time goes on until it is a permanent thing, so it is just as easy to say and more iteological (sic) to say that Arthur was having his onset or premature beats or what-have-you at the time he first had his symptoms until finally a point was reached where it was more or less continuous until he became treated.”
Dr. Selser, defendant’s expert, concurred when he was asked:
“Q. The palpitation and premature beats would be a sort of a forerunner of flutter or fibrillation, wouldn’t it? A. It could be, not necessarily.” (tr-60).
Further answering the question, he said:
“Considering this particular case we would agree the man had arteriosclerotic heart disease and then he had strain and had these premature beats developing, and then if they persisted and subsequently because of that irregularity and his condition he would be probably more prone or easily develop auricular fibrillation than if that had not occurred beforehand.”
And he further stated, in answer to appellant’s question:
“Q. Doctor, does physical exertion,- — is it necessarily the cause of *490 auricular fibrillation? A. No, sir, I wouldn’t say it is necessarily the cause. I would say that excessive physical exertion or fatigue or strain could aggravate and could be a contributing factor in such a condition.”
Dr. Stotler further testified that flutter and fibrillation are both classified as ar-rythmia, and are not ailments usually brought about spontaneously, but on the contrary there is usually some provocation. It is Dr. Stotler’s expert opinion that in his medical experience these irregularities are very rarely brought about without provocation. And then he further adds that what the plaintiff was doing on the night of January 9 would be provocation enough. Dr. Lorio differs with this opinion, but nevertheless did admit that it was his opinion , that violent effort and exertion could and would send the heart into auricular fibrillation and that violent effort and exertion physically or emotionally could set a diseased heart into fibrillation.
In Sharp v. Esso Standard Oil Co., First Cir.Ct. of Appeals, 72 So.2d 601, 611 (Writ of certiorari denied), this court said:
“It is now well settled that to constitute an accident within the meaning of the Workmen’s Compensation Law in cases where the work of the claimant entails regularly heavy physical effort, it is hot necessary that the injury from which disability follows be the result of unusual physical effort. If a diseased organ gives way while the laborer is performing his usual and customary heavy duties, and disability results, it is compensable. This doctrine is affirmatively established by the following cases (list of cases).”
In view of the medical testimony in this case and the holding of the court in the Sharp case, it is the considered opinion of this court that this plaintiff suffered an accident within the meaning of the workmen’s compensation law of this State, LSA-R.S. 23:1021 et seq.
Defendant takes the position that when Neldare drank the cool-ade and he became unconscious he suffered for the first time an acute attack of fibrillation. He further contends that the hospital records show when the regular rhythm was corrected the fibrillation ceased. It is his contention that no one can tell when Neldare’s heart may again fibrillate and that it is entirely in the field of speculation. For this court to sustain that view, it would have to brush aside and ignore the expert medical testimony hereinabove. Two cases are cited by defendant as authority to sustain his position : Hastings v. Homewood Development Company, La.App., 84 So.2d 883, 887, and the case of Kraemer v. Jahncke Services, La.App., 83 So.2d 916, as well as Professor Malone in his work on Louisiana Workmen’s Compensation, page 314. These authorities are inapposite to the issue here. The court in the Kraemer case held that the deceased suffered his first attack a few days before at home and had a serious attack at home the previous evening to the date of the alleged accident. In the Hastings case, the court found that plaintiff had failed to establish the actual occurrence of the heart attack while engaged in the course of his employment, and secondly, failed to prove casual connection between his work and resulting disability. There was a total lack of medical testimony for plaintiff.
We will now examine the question of total and permanent disability. In that connection we observe Dr. Stotler’s report which he made after examining and treating the plaintiff, stating:
“It is my opinion that the arterio-sclerotic heart disease was present at the time of Arthur’s acute illness but that the acute episode of auricular fibrillation and myocardial insufficiency was precipitated by the manual labor and associated conditions under which Arthur was working at the time of his illness. I also feel that because of the exertional dyspnea or shortness of breath now present that Arthur should *491 not and in fact could find it impossible to return to any work requiring the physical exertion necessary in his previous employment.”
Counsel for defendant, in an effort to sustain his position that the flutter suffered by plaintiff on the night of January 9th had no connection with the heart attack that he suffered at the time he drank the cool-ade on Friday evening, questioned Dr. Stotler, thus: “Assuming this fibrillation had first started when Arthur drank a cool-ade, would you then attribute the fibrillation in any way to his employment?” The doctor answered: “We are by your question ignoring any symptoms that he had prior to the cool-ade?” The doctor then added that he would be forced to say that the type of work he did in addition to the cool-ade incident hastened his entering into a period of disability, such as he was at that time and that he could not ignore the first symptoms or flutter which took place on the job. The hospital record prepared by Dr. Lorio, defendant’s own doctor, stated that the complaint was “fluttery of heart — date of onset, January 9, 1957— Present illness — While at work noticed his heart fluttery, — continued working and noticed flutter every 20 minutes to 1/£ hour it would flutter painless and subside spontaneously in several seconds and that again on January 10, 1957 occurred when doing moderately hard labor”.
The testimony of all doctors is to the effect that the plaintiff is permanently and totally disabled. Defendant contends, however, that the fibrillation was converted, that is the rhythm was restored and that plaintiff has been cured and therefore is not permanently disabled. The record shows that this conversion was achieved by drugs prescribed by the doctors. The heart specialist, Dr. Stotler, testified that his condition is a permanent one and not one that is curable and that he will have to continue under medical care indefinitely. The same expert stated in his report which was read in the record as follows:
“It is my opinion that the arterioscle< rotic heart disease was present at the time of Arthur’s acute illness but that the acute episode of auricular fibrillation and myocardial insufficiency was precipated by the manual labor and associated conditions under which Arthur was working at the time of his illness. I also feel that because of the type of heart disease present and because of the exertional dyspnea or shortness of breath now present that Arthur should not and in fact could find it impossible to return to any work requiring the physical exertion necessary in his previous employment.”
The lower court computed his compensation on a five day week of $50, being 65% of $50 or $32.50 per week. We have no difficulty in recognizing the jurisprudence to be that the compensation should be computed on a six day work week instead of a five day work week. In the case of Moore v. Aysen, La.App., 69 So.2d 551, 554, this court quoted the Supreme Court in Jarrell v. Travelers Ins. Co., 218 La. 531, 50 So.2d 22, 23, as follows:
“(A)n injured workman is entitled to compensation at the rate of pay in effect on the actual day of the injury, based not upon the number of days per week he was employed but upon the number of days he could possibly have secured employment had he not been injured, or six days a week.”
This rule was reaffirmed in the case of Martin v. Great American Indemnity Co., La.App., 75 So.2d 415, 420 and by the Supreme Court of Louisiana in the case of Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, 404. In the latter case, the Supreme Court reviewed prior decisions on the subject and put to rest once and for all the correct interpretation of LSA-R.S. 23:1021(11) in saying:
“After determining an employee’s daily wage, the six day week is to be employed in calculating his weekly *492 wage. If he is injured, he is deprived of this ability to work six days per week, and remuneration is awarded him for this deprivation. This test must be applied regardless of the number of days he works for the particular employer, by whom he is employed at the time of his injury.”
Accordingly, the judgment of the District Court will be amended to provide that plaintiff be awarded the maximum computation of $35 a week in lieu of the $32.50 awarded by the District Court, and in all other respects, the judgment of the District Court is affirmed.
Amended and affirmed.